**Lance ANDERSON, Appellant,**

v.

**TUBOSCOPE VETCO, INC. and Olsten Staffing Services, Appellees.**

No. S–9080.

Supreme Court of Alaska.

Oct. 6, 2000.

Michael J. Schneider, Anchorage, and John C. Dittman, Anchorage, for Appellant.

Robert L. Griffin and Linda J. Hiemer, Law Offices of Robert L. Griffin, Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Lance Anderson appeals the superior court's grant of summary judgment to Tuboscope Vetco, Inc. (Tuboscope) and Olsten Staffing Services (Olsten) on Anderson's negligence claim against Tuboscope for injuries he suffered while working as a temporary employee at Tuboscope's plant. Anderson argues that the superior court erred in ruling that Tuboscope was Anderson's special employer and was therefore exempted from suit by the exclusive remedy provision of the Alaska Workers' Compensation Act. Anderson further argues that the superior court erred in failing to assess a portion of Tuboscope's costs and fees against Olsten as a partially subrogated insurer.

Because the superior court ruled correctly on both the summary judgment and the attorney's fees issues, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

In 1991 Olsten and Tuboscope entered into a continuing contract agreement for Olsten to provide temporary employees to Tuboscope to assist Tuboscope in its business of providing oilfield-related materials and services. Olsten provided Tuboscope with various categories of temporary employees, including "personnel transfer plan" (PTP) employees. Tuboscope recruited, hired, placed, and directly and exclusively supervised PTP employees; Olsten provided the payroll administration, benefits, and workers' compensation coverage for PTP employees.

In October 1994 Tuboscope hired Anderson as a PTP employee. Pursuant to the provisions governing PTP employees laid out in Tuboscope and Olsten's contract, Anderson was recruited, interviewed, and placed in his position by Tuboscope. Tuboscope also set Anderson's wages[1] and had the authority to fire him without the prior approval or consent of Olsten.

Anderson's daily work activities at the Tuboscope job site were supervised by Tuboscope employees. His direct supervisor was Tuboscope employee Frank McAnally.

[1] Olsten issued Anderson's paycheck, based on the hours he worked for Tuboscope. Tuboscope reimbursed Olsten for Anderson's wage, plus an additional 32% to cover Anderson's payroll administration and workers' compensation insurance. There is no record of Anderson having any other contact with Olsten.

On December 30, 1994, Anderson was injured at Tuboscope's job site in Kenai when Ronald Finch, a Tuboscope employee, picked up some drill pipe in a manner that caused Anderson to fall and hurt his shoulder. Anderson's injury occurred while he was performing job duties directed and supervised by McAnally. Subsequent to his injury, Anderson received workers' compensation benefits through the policy secured by Olsten.[2]

### B. *Proceedings*

In December 1996 Anderson filed a complaint against Tuboscope in superior court. Tuboscope filed a third party complaint against Olsten in April 1997 to enforce its agreement with Olsten that Olsten would hold harmless and indemnify Tuboscope.

The parties cross-moved for summary judgment, seeking a determination as to whether the exclusivity provisions of the Alaska Workers' Compensation Act (the Act) barred Anderson's suit. Olsten later filed an opposition to Anderson's motion for summary judgment, alleging that Tuboscope was a joint or dual employer of Anderson and was therefore immune from common law tort liability.

On March 27, 1998, the superior court granted Tuboscope's motion for summary judgment, finding that an implied contract of employment existed between Anderson and Tuboscope and that Anderson's claims against Tuboscope were consequently barred by the exclusive remedy provision of the Act. The superior court also assessed $5,693.70 in costs and attorney's fees against Anderson, declining to rule that Olsten was liable for a portion of the costs and fees. Anderson now appeals.

### III. *STANDARD OF REVIEW*

 We review a grant of summary judgment *de novo*.[3] The question of whether the superior court erred in failing to enter a portion of Tuboscope's costs and fees against Olsten as a partially subrogated insurer is a legal question that we also review *de novo*.[4]

### IV. *DISCUSSION*

#### A. *As Anderson's Employer, Tuboscope Is Immune from Tort Liability under the Exclusive Remedy Provision of the Alaska Workers' Compensation Act.*

The primary question raised in this appeal is whether a labor service company's employee, who is assigned to a temporary employer, makes a contract of hire with the temporary employer and thus comes under the exclusive remedy provision of Alaska's Workers' Compensation Act.[5] Anderson argues that Tuboscope is subject to tort liability for his injury because he is not a Tuboscope employee. We disagree. Temporary employees are employees of the temporary employer for workers' compensation purposes as a matter of law.

#### 1. *Tuboscope was Anderson's employer at the time of his injury.*

Although this is a case of first impression in Alaska, the question of a temporary employee's ability to sue a temporary employer

---

**2.** On August 14, 1995, Tuboscope hired Anderson as a full-time regular employee. From this point forward, Anderson was no longer a PTP employee for whom administrative services were provided by Olsten. Tuboscope now pays Anderson directly, provides him with benefits, and covers him for workers' compensation.

**3.** *See Wilson v. Municipality of Anchorage,* 977 P.2d 713, 719 (Alaska 1999).

**4.** *See State v. Arbuckle,* 941 P.2d 181, 184 (Alaska 1997) (stating that attorney's fees award is reviewed under the *de novo* standard because it involves contract interpretation); *Palmer G. Lewis Co. v. ARCO Chemical Co.,* 904 P.2d 1221,

1234 n. 31 (Alaska 1995) ("Review of attorney's fees based on indemnity is a question of law which we may review *de novo*.").

**5.** Alaska Statute 23.30.055 provides that workers' compensation is the exclusive remedy available against an employer to an employee injured at work. In this case, the parties do not dispute that workers' compensation is the exclusive remedy available to an employee against the employer, nor do they dispute any facts. Rather, the parties dispute the legal consequences of the undisputed facts. Therefore, the question before us is whether Anderson was an employee of Tuboscope.

in tort has been addressed in numerous jurisdictions.[6]

■ Under the "special employment" doctrine, temporary agency employees are employees of both the temporary agency and the company to which they are assigned.[7] This doctrine states that if a labor broker contracts to provide the services of a temporary employee to a customer company, which serves as a temporary employer, the labor broker is considered a "general employer" and the company is considered a "special employer." [8] As a special employer, the temporary employer is considered to have the same rights and privileges as a regular employer for workers' compensation purposes.[9] Consequently, the exclusive remedy provision of the workers' compensation act [10] generally precludes a temporary employee from suing the temporary employer for negligence in connection with a work-related activity.[11]

■ In his treatise on workers' compensation law, Professor Larson sets forth a commonly used test for determining whether a special employer is liable for workers' compensation (and therefore immune from tort liability):

When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if:

(a) the employee has made a contract of hire, express or implied, with the special employer;

(b) the work being done is essentially that of the special employer; and

(c) the special employer has the right to control the details of the work.

When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation.[12]

Although we have not previously addressed the question at issue in the instant case, we have recognized and used Professor Larson's test in other contexts.[13] In keeping with our earlier decisions, we today adopt this test as the standard for determining workers' compensation liability in the temporary employee context. We hold that Tuboscope meets all three requirements of this test.

### a. *Anderson had an implied contract of employment with Tuboscope.*

■ The very nature of the contract between Olsten and Tuboscope suggests that

6. *See* cases cited *infra* note 11.

7. *See Wedeck v. Unocal Corp.,* 59 Cal.App.4th 848, 69 Cal.Rptr.2d 501, 505 (1997); *Ruble v. Arctic General, Inc.,* 598 P.2d 95, 97 n. 3 (Alaska 1979) (citation omitted). Although we have not previously addressed the present situation, we have acknowledged the "special employment" doctrine in the context of deciding whether a general employment relationship existed at the time of the employee's accident. *See id.* at 97–98.

8. *See* 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 48.23, at 8–524, 528, 532 (1997).

9. *See Wedeck,* 69 Cal.Rptr.2d at 505.

10. *See* AS 23.30.055.

11. *See Pettaway v. Mobile Paint Mfg. Co.,* 467 So.2d 228, 229–30 (Ala.1985); *Araiza v. U.S. W. Bus. Resources, Inc.,* 183 Ariz. 448, 904 P.2d 1272, 1276 (Ariz.App.1995); *Wedeck,* 69 Cal. Rptr.2d at 505; *Kelly v. Geriatric and Med. Servs. Inc.,* 287 N.J.Super. 567, 671 A.2d 631, 634, *aff'd sub nom. Kelly v. Geriatric & Med. Ctrs., Inc.,* 147

N.J. 42, 685 A.2d 943 (1996) (per curiam); *Vigil v. Digital Equip. Corp.,* 122 N.M. 417, 925 P.2d 883, 887 (N.M.App.1996); *Shoemaker v. Manpower, Inc.,* 223 A.D.2d 787, 635 N.Y.S.2d 816, 817–18 (1996); *Poirier v. Manpower Inc. of Providence,* 689 A.2d 1036, 1036–37 (R.I.1997) (per curiam); *Goodman v. Sioux Steel Co.,* 475 N.W.2d 563, 564–65 (S.D.1991).

12. Larson & Larson, *supra* note 8, § 48.00, at 8–434. Cases that apply this test in similar contexts include *Pettaway,* 467 So.2d at 229; *Vigil,* 925 P.2d at 886–87; and *Goodman,* 475 N.W.2d at 564–65. While this test focuses on liability for workers' compensation, it is useful here because an employer's liability to an employee for common-law negligence is precluded by that employer's liability for workers' compensation under the Alaska Workers' Compensation Act. *See* AS 23.30.055.

13. *See Cluff v. NANA–Marriott,* 892 P.2d 164, 168–71 (Alaska 1995) (using portions of this test to determine workers' compensation coverage in lent-employee context); *Ruble,* 598 P.2d at 97–98 (using this test to determine whether employee of subcontractor could sue general contractor for negligence).

an implied employment contract existed between Tuboscope and Anderson.[14] The contract between Olsten and Tuboscope regarding PTP employees effectively provided that Tuboscope would interview, hire, train, and employ the PTP employees, while Olsten would provide payroll administration and workers' compensation insurance premiums. Under this arrangement, Anderson's primary employment contact from the time of his initial interview was with Tuboscope. He had no contact with Olsten whatsoever except to fill out forms for them and receive his paycheck from them. When he worked, all of his assignments were given to him by Tuboscope management and were performed for the sole benefit of Tuboscope, not Olsten. Aside from the fact that Olsten performed administrative tasks for Tuboscope regarding his employment, there is no essential difference between Anderson and a regular Tuboscope employee.[15]

██ If the temporary employer hires, trains, employs, directs, and reserves the right to terminate the temporary employee, and the labor broker merely acts in the capacity of a payroll and benefits administrator, an employment contract exists between the temporary employer and the temporary employee.[16] The type of temporary employment situation existing in the instant case satisfies this standard.

14. The parties do not dispute that there was no express employment agreement between Anderson and Tuboscope.

15. Anderson does cite a number of superficial differences between PTP employees and regular Tuboscope employees. However, it is immaterial that Tuboscope treated Anderson differently from its other employees. Tuboscope is Anderson's special employer, not his general employer; therefore, he shares a different relationship with Tuboscope than its general employees. This special employment relationship does not bring Anderson or Tuboscope out of the ambit of workers' compensation.

16. In *Cluff v. NANA–Marriott*, we stated that "[a]n implied employment contract is formed by a relation resulting from the manifestation of consent by one party to another that the other shall act on his behalf and under his control, and consent by the other so to act." 892 P.2d at 171 (internal quotation marks omitted) (quoting

When Anderson first sought employment with Tuboscope, he interviewed directly with the company. His job duties and the terms of his employment were communicated to him by Tuboscope personnel. Anderson was also told that Tuboscope had the right to terminate him without the consent of Olsten. He did not have any contact with Olsten until after he was hired by Tuboscope, at which time he filled out various forms and paperwork. Anderson worked at Tuboscope's facility and was directly supervised and given assignments by a Tuboscope employee. Tuboscope provided his tools and equipment. Anderson's only contact with Olsten, after he filled out the forms, was to receive his paychecks from Olsten.

Tuboscope's acts of hiring Anderson, assigning him work, and paying him, manifest its consent that Anderson would act on its behalf and under its control. Anderson's acts of accepting work from Tuboscope, and working at its facilities under the exclusive control and supervision of Tuboscope employees, constitute consent by him to act on Tuboscope's behalf and under its control. Therefore, Anderson and Tuboscope had an implied employment contract.

Because an implied employment contract between Anderson and Tuboscope existed, the first prong of the Larson test for determining whether Tuboscope is a special employer that is covered by the Act's tort immunity is satisfied.[17]

*Childs v. Kalgin Island Lodge*, 779 P.2d 310, 314 (Alaska 1989)).

17. Anderson argues that Tuboscope should not be considered an employer for workers' compensation purposes because Olsten, not Tuboscope, paid for his workers' compensation insurance premiums. However, the fact that Tuboscope did not directly provide workers' compensation coverage is immaterial. Under the contract between Tuboscope and Olsten, Tuboscope reimbursed Olsten for the wages it paid Anderson; Tuboscope also paid Olsten an additional 32 percent to cover Olsten's payroll administration and other costs associated with Anderson. Because the contract between Olsten and Tuboscope specified that Olsten must provide workers' compensation coverage for PTP employees, a portion of Tuboscope's 32 percent payment effectively constitutes a payment of Anderson's workers' compensation premium. *See Sorenson v. Colibri Corp.*, 650 A.2d 125, 130 (R.I.1994).

b. *Anderson performed his work exclusively for Tuboscope.*

■ The second prong of the Larson test—that the work being done by the employee must be essentially that of the special employer [18] — is met here. It is undisputed that all of Anderson's work was for Tuboscope. He worked exclusively at Tuboscope's facilities, performed tasks as directed by Tuboscope management, and was exclusively supervised by a Tuboscope employee. Tuboscope provided his tools and equipment.

Anderson's limited relationship with Olsten provides further evidence that the work he performed was solely for Tuboscope. His only contact with Olsten was to receive his paychecks; he performed no duties for Olsten. In fact, Anderson never even met in person with Olsten management or employees. We therefore conclude that the second prong of the Larson test is met.

c. *Tuboscope had complete control over Anderson's work.*

■ The third prong of the Larson test is that the special employer must have the right to control the details of the employee's work.[19] In this case, Tuboscope clearly had the right to control the details of Anderson's work. As mentioned above, he was supervised only by Tuboscope employees. His work never came under the review of Olsten.

Because (1) Anderson and Tuboscope had an implied contract of employment; (2) the work performed by Anderson was exclusively for Tuboscope; and (3) Tuboscope had the right to control Anderson's work, the three parts of the Larson test are satisfied. Consequently, Tuboscope is the type of special employer that comes under the reach of the Alaska Workers' Compensation Act, and Anderson's exclusive remedy against Tuboscope is workers' compensation. The trial court's grant of summary judgment to Tuboscope was therefore proper.

B. *Olsten Is Not Liable for the Superior Court's Award of Costs and Attorney's Fees Against Anderson.*

■ Anderson argues that the trial court erred in entering an award of attorney's fees and costs against him only and not against him and Olsten jointly and severally. He asserts that had he prevailed in this action, Olsten would be unjustly enriched by recouping the workers' compensation payment its insurer made to Anderson without Olsten having to bear the costs and burden of litigation. Anderson also contends that Olsten is liable for costs and fees because it is a "partially subrogated insurer" that is essentially a real party in interest in the present case. We disagree.

■■ The general principle of the doctrine of unjust enrichment is that "one person should not be permitted unjustly to enrich himself at [the] expense of another, but should be required to make restitution of or for property or benefits received, retained or appropriated." [20] As its definition indicates, the doctrine of unjust enrichment is predicated on the theory of restitution: When a party unjustly receives, retains, or appropriates property or a benefit, the party should repay the source of the property or benefit. There is nothing in this doctrine that suggests that a party must pay restitution for the creation of a rather slim possibility that the party may receive some benefit in the future.

In the present case, Anderson lost on summary judgment. Therefore, Olsten gained nothing by Anderson's prosecution of his action against Tuboscope. If anything, Olsten lost by having to defend Tuboscope's third-party suit. Consequently, Anderson's unjust enrichment argument fails, and Olsten is not liable for attorney's fees and costs on this ground.

Anderson alternatively argues that our decision in *Truckweld Equipment Co. v. Swenson Trucking & Excavating, Inc.*[21] requires

---

**18.** *See* Larson & Larson, *supra* note 8, § 48.00, at 8–434.

**19.** *Id.*

**20.** *Black's Law Dictionary* 1535 (6th ed.1990).

**21.** 649 P.2d 234, 238–39 (Alaska 1982) (stating that where plaintiff was suing for property damage for which it had been partially reimbursed by insurer, insurer could be considered a real party in interest if insurer was timely joined in action).

us to hold that Olsten is a "partially subrogated insurer" who is a real party in interest subject to an assessment of fees and costs. However, Anderson disregards our explicit statement that "our holding in *Truckweld* should not be applied in the workers' compensation context due to the specific statutory procedures set out in AS 23.30.015." [22]

Because Anderson's arguments as to why Olsten should be held jointly and severally liable for the attorney's fees and costs arising out of this action are meritless, we affirm the superior court's ruling that these fees and costs be assessed only against Anderson.

## V. CONCLUSION

Because the trial court ruled correctly on both the summary judgment and the attorney's fees issues, we AFFIRM.

---

**22.** *Exxon Corp. v. Alvey,* 690 P.2d 733, 744 (Alaska 1984).