BOLGER, Chief Justice.
*141 I. INTRODUCTION
A worker for a temporary employment service was injured while working for a shipping company. At the time of injury he was performing a task prohibited by the contract between the temporary employment service and the shipping company. The injury resulted in loss of the worker's hand and part of his arm. After getting workers' compensation benefits from the temporary employment service, the worker brought a negligence action against the shipping company and one shipping company employee. The superior court decided on cross-motions for summary judgment that the exclusive liability provision of the Alaska Workers' Compensation Act (Act)[1] barred the action. We reverse the grant of summary judgment because material issues of fact preclude it.
II. FACTS AND PROCEEDINGS
John Buckley started working for Labor Ready, Inc., a temporary employment service, in 2009. According to Buckley, workers would go to the Labor Ready office in the morning for assignments, and "there would be some days that [they] would be sent out and some days when there would be no work." Workers with assignments were given a "ticket" that they presented to the company using Labor Ready's services. Labor Ready employees could get "repeat" tickets when a contracting employer wanted Labor Ready to send those employees again, but Labor Ready did not always honor such requests. Labor Ready workers had to get approval from Labor Ready to work for a specific customer even if the customer and the worker both wanted the worker to continue to work for that customer.
The "conditions of service" on the ticket prohibited Labor Ready employees from engaging in specified activities without Labor Ready's "prior written consent." For purposes of this case, the important restriction was that Labor Ready workers were not allowed "to operate dangerous machinery, mobile equipment or vehicles." Labor Ready paid the worker and provided workers' compensation coverage. The customer was required to determine whether Labor Ready's workers were qualified for the particular work assignment "during the first two hours of work" and "inform Labor Ready of any changes in work assignment." The contract provided that Labor Ready's employees were "under Customer's supervision, direction and control" and required the customer to provide safety equipment, information, and briefing to Labor Ready's employees. The contract did not specifically provide that a customer could fire a worker supplied by Labor Ready.
Labor Ready's workers did not have to report for work every day; as Buckley put it, it was "up to you to go." He testified that Labor Ready employees could call beforehand to let Labor Ready know they would not be there, but if employees did not, Labor Ready "didn't really care" and would "put somebody else" on the job. Buckley, for example, did not work for several weeks in 2011 because he was helping care for his mother.
During the time he worked for Labor Ready, Buckley reported to Labor Ready's office in the morning and picked up a ticket with his job assignment. Buckley prided himself on being a good worker and testified that Labor Ready at times sent him to work for new clients to impress the clients even if another client had requested Buckley for those days. In late 2011 Labor Ready at times assigned Buckley to work at American Fast Freight as a general laborer; he worked 17 non-consecutive days for American Fast Freight during the six weeks preceding the accident underlying this case.
Buckley enjoyed his work with American Fast Freight; "the goal was that [Buckley] wanted to go to work as an employee of American Fast Freight ... and American Fast Freight was hoping to hire [him]." But Buckley also testified that Labor Ready had sent him to work elsewhere, even when American Fast Freight had requested him. When he worked for American Fast Freight his job mainly involved loading and unloading *142 freight. On any given day he might work in the warehouse or be assigned to a particular truck to accompany the driver for deliveries. During the time Buckley was assigned to American Fast Freight he got to know some of the drivers and had established relationships with some of them. Buckley indicated he could refuse to work with a truck driver there and that he had done so.
On December 22, 2011, Labor Ready assigned Buckley to work at American Fast Freight. A driver, Denny Hawkins, told Buckley to come with him to deliver freight in the Wasilla area. Buckley grabbed "[his] stuff" - his "stuff" included a box knife, warm clothes, and an extra pair of gloves - and went out to Wasilla with Hawkins. After they completed their deliveries, Hawkins told Buckley he would treat him to lunch. Hawkins told American Fast Freight's dispatcher that he and Buckley were headed to lunch. According to Buckley, Hawkins got a call on his cell phone from another driver, Matthew Carroll, asking Hawkins for assistance, and Hawkins agreed to help him without informing the dispatcher.[2] Carroll's tractor-trailer was stuck in a snow berm near the Frontiersman newspaper office in Wasilla, and he was unable to move it.[3] Instead of going to lunch, Hawkins and Buckley headed to Carroll's truck.
Hawkins unhitched his trailer and drove his truck so it was facing Carroll's truck; he then attached a tow chain to the trucks. In the meantime Buckley began to dig out the stuck wheel, first using his hands and then a shovel, but Carroll's truck remained stuck. The precise sequence of events that followed is difficult to discern because witnesses gave inconsistent accounts at different times, but someone decided to use tire chains to try to gain traction. American Fast Freight drivers sometimes laid tire chains out on the ground, rather than put them around the tire, to improve traction when a truck was stuck on snow or ice: Buckley said he had seen other American Fast Freight drivers do so and had assisted them in the past; Carroll said he too had previously used chains this way and had seen others do it; and Hawkins also indicated he had done this before. Two company officials reported during the subsequent accident investigation that drivers used chains this way at times, and company officials indicated that American Fast Freight was aware of the practice - one official said he had himself used chains this way as an American Fast Freight driver.
Buckley laid a tire chain in front of the wheel and used hand and verbal signals to let the drivers know when he was clear of the truck. Carroll then tried to move the truck to engage the chain and get traction. The method was not successful, and in fact the wheel's spinning caused the tire chain to shoot out the back. The three men used the same approach four times with no success. Buckley then thought of laying a second chain behind the wheel, because he "noticed [Carroll] was rocking back a little bit." He asked Carroll where another chain was and got a second chain from one of the trucks so there would be a chain both in front of and behind the stuck wheel.
The accident happened on the fifth attempt to move the truck. The drivers reported being focused on their trucks because they were concerned about a collision if Carroll got traction. According to Buckley, he was in the process of positioning the second tire chain behind the stuck wheel when Carroll gunned the truck engine; the wheel turned and caught the tire chain Buckley was adjusting, pulling his arm under the wheel. Buckley later said he had not given Carroll "any signal or indication ... to move the *143 vehicle." Hawkins noticed something amiss, got out of his truck, ran toward Buckley, and told Carroll to "put it in gear and spin it" because Buckley's hand was trapped. Hawkins went to the Frontiersman's office to get help. Buckley's arm was sliced just below the elbow and, in every practical sense, severed - the two parts of his arm remained barely attached. Buckley was also bleeding heavily. Frontiersman employees and the two drivers assisted Buckley. One Frontiersman employee used his belt as a tourniquet to staunch the bleeding until emergency medical personnel arrived; Buckley credited him with saving his life. Buckley had multiple surgeries, and according to American Fast Freight, his right arm was amputated above the elbow. He received workers' compensation benefits, presumably from Labor Ready given the terms of the contract between Labor Ready and American Fast Freight.
The Alaska Department of Labor & Workforce Development, Division of Labor Standards & Safety, Occupational Safety & Health (AKOSH) conducted an investigation that ultimately led to a $ 5,600 fine against American Fast Freight. American Fast Freight indicated that Buckley should not have been engaged in any activities related to freeing the truck and said "that for [the] future, [the] company has specifically prohibited temporary employees from being involved with tire chain up and stuck vehicles." According to AKOSH, the workers' actions during the incident reflected a number of violations of company policy.
In November 2013 Buckley sued American Fast Freight, Carroll, and John Does 1-5 for negligence. American Fast Freight and Carroll answered, denying liability and raising the exclusive liability provision of the Act, AS 23.30.055, as a defense. No one joined Labor Ready.
The parties filed cross-motions for summary judgment. American Fast Freight argued that it met all three tests for a special employer relationship set out in Anderson v. Tuboscope Vetco, Inc.[4] and that Buckley's suit was barred by AS 23.30.055 on that basis.[5] Buckley's cross-motion sought to bring his case under Estate of Milos v. Quality Asphalt Paving, Inc. ,[6] where we reversed a summary judgment on exclusive remedy grounds because a material issue of fact remained about the "work-relatedness" of the injury, i.e. whether it arose out of and in the course of employment.
Pertinent to the question of a special employment relationship, Buckley argued that (1) no contract existed between himself and American Fast Freight; (2) Tuboscope was factually distinguishable from his case for various reasons, including that he reported to Labor Ready rather than American Fast Freight; and (3) the special employment doctrine did not apply to his case because Labor Ready continued to exercise control over its employees' duties through its customer contract. And with respect to his own cross-motion for summary judgment, Buckley contended that as a matter of law the injury did not arise out of and in the course of the employment because (1) he was on an unpaid lunch break when the accident happened; (2) using the tire chains as the workers did amounted to operating dangerous machinery, a violation of the contract between Labor Ready and American Fast Freight; (3) Hawkins's and Carroll's actions violated company policy; and (4) he had personal motives for participating in the activity. Buckley supported his assertion about operating dangerous machinery with a mechanical engineer's expert opinion.
In opposition to Buckley's motion, American Fast Freight said that for purposes of summary judgment, it would assume several facts, including the following: Carroll and Hawkins violated employer rules; "letting Buckley handle tire chains ... violated the contract between Labor Ready and [American Fast Freight]"; and Buckley and Hawkins were on an unpaid lunch break at the time they went to assist Carroll. It argued that even if those facts were true, Buckley's *144 lawsuit was still barred by the exclusive remedy provision.
The superior court granted summary judgment to American Fast Freight, deciding it was shielded by the exclusive liability provision of the Act. The superior court first considered the three-part test in Tuboscope ,[7] deciding as a matter of law that (1) Buckley had an implied employment contract with American Fast Freight; (2) his work was done exclusively for the benefit of American Fast Freight; and (3) American Fast Freight had the right to supervise Buckley. From these findings the court concluded that American Fast Freight was Buckley's employer and was, in addition to Labor Ready, liable for workers' compensation benefits for the accident.
The court then turned to whether Buckley's injuries arose out of and in the course of his employment with American Fast Freight and decided as a matter of law that they did. Applying factors discussed in Estate of Milos ,[8] the court decided that Buckley being on an unpaid lunch break was immaterial because of the "strong nexus between Buckley's action and his employment with [American Fast Freight]." It also decided that Buckley's injury was "reasonably foreseeable from his employment" because "[a] truck getting stuck in the snow is not an uncommon occurrence in Alaska" and "it was common practice for nearby [American Fast Freight] employees to be called to assist other drivers."
The court decided that the following facts were immaterial to the question of work-relatedness: (1) Buckley's activity was outside his job duties; (2) the activity was prohibited by the contract between American Fast Freight and Labor Ready; and (3) American Fast Freight admitted to AKOSH that Buckley was injured performing a task "outside the scope of his duties." The superior court granted summary judgment to American Fast Freight based on the exclusive remedy provision and denied summary judgment to Buckley,[9] dismissing the case and entering final judgment against Buckley. Buckley appeals.
III. STANDARD OF REVIEW
We review a grant of summary judgment de novo.[10] "Summary judgment is proper if there is no genuine factual dispute and the moving party is entitled to judgment as a matter of law."[11] "[A] party seeking summary judgment has the initial burden of proving, through admissible evidence, that there are no disputed issues of material fact and that the moving party is entitled to judgment as a matter of law."[12] If the moving party makes that showing, "the burden shifts to the non-moving party 'to set forth specific facts showing that he could produce evidence reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact exists.' "[13] "[A] material fact is one upon which resolution of an issue turns."[14] "The standard for finding a genuine issue of fact at summary judgment is lenient."[15] Whether a person is an employee for purposes of the Workers' Compensation Act is a mixed question of law and fact.[16]
*145 IV. DISCUSSION
A. Material Factual Disputes Precluded Summary Judgment On The Special Employment Relationship.
The superior court granted American Fast Freight's summary judgment motion, deciding as a matter of law that American Fast Freight was Buckley's special employer under the test we adopted in Anderson v. Tuboscope Vetco, Inc.[17] In that case we adopted a three-part test for special employment relationships from Larson's treatise on workers' compensation:
When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if:
(a) the employee has made a contract of hire, express or implied, with the special employer;
(b) the work being done is essentially that of the special employer; and
(c) the special employer has the right to control the details of the work.[18 ]
When these conditions are satisfied in relation to both the general employer and the special employer, then both employers are liable for workers' compensation.[19]
Although Tuboscope is our most recent decision about the special employment relationship, we acknowledged in Tuboscope that we had applied parts of the special employment doctrine in prior cases.[20] In Cluff v. NANA-Marriott , we stated that "the requirements for finding an employment relationship for workers' compensation purposes between a lent employee and a special employer are stricter than the standards for finding an employment relationship between an employee and an employer where there is only one employer."[21]
Determining whether an implied employment contract was formed involves "considering all the factors in light of the surrounding circumstances."[22] "An implied employment contract is formed by a relation resulting from 'the manifestation of consent by one party to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' "[23] In the special employment context, we have also noted Larson's "great emphasis on the importance of a contract for hire with a special employer"[24] because in a special employment relationship, the employee "loses the right to sue the special employer at common law for negligence; and ... the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit."[25]
The parties here disagree about the existence of an implied contract of hire between Buckley and American Fast Freight.[26] Buckley has consistently argued that his employment *146 relationship with American Fast Freight is different from the employment relationship described in Tuboscope and that no special employment relationship existed between himself and American Fast Freight. In contrast American Fast Freight has argued that its relationship with Buckley falls squarely within the framework set out in Tuboscope .
Tuboscope involved two companies, Tuboscope Vetco, Inc. and Olsten Staffing Services, that had "a continuing contract agreement for Olsten to provide temporary employees to Tuboscope," including a category of employees called PTP ("personnel transfer plan") employees.[27] "Tuboscope recruited, hired, placed, and directly and exclusively supervised PTP employees; Olsten provided the payroll administration, benefits, and workers' compensation coverage for PTP employees."[28] A PTP employee was injured while working for Tuboscope; he received workers' compensation benefits from Olsten and later sued Tuboscope.[29] After adopting the three-part test from Larson's treatise, we applied it to the facts of the case and held that Tuboscope met all of the tests.[30]
We stated, "If the temporary employer hires, trains, employs, directs, and reserves the right to terminate the temporary employee, and the labor broker merely acts in the capacity of a payroll and benefits administrator, an employment contract exists between the temporary employer and the temporary employee."[31] We noted in our discussion that "[t]he contract between Olsten and Tuboscope regarding PTP employees effectively provided that Tuboscope would interview, hire, train, and employ the PTP employees."[32]
The written contract between Labor Ready and American Fast Freight lacked several of these provisions, and the only additional pieces of evidence American Fast Freight submitted to the superior court were portions of Buckley's deposition testimony, a copy of the work ticket from the day Buckley was injured, a copy of the "Conditions of Service" in its contract with Labor Ready, and copies of some invoices from Labor Ready to American Fast Freight, showing that Buckley had worked at American Fast Freight on November 21.
Unlike the worker in Tuboscope , Buckley did not "interview[ ] directly with" American Fast Freight, and no evidence shows that American Fast Freight recruited him.[33] The uncontested facts showed that while American Fast Freight may have requested Buckley as a worker, as the superior court noted, Labor Ready was evidently not obligated to comply with the request and provide Buckley as a worker to American Fast Freight. Buckley testified that Labor Ready had sent him to work for other clients of Labor Ready, even when American Fast Freight had requested him.[34] Buckley's testimony does not establish that American Fast Freight could hire him as that term is generally understood,[35] nor does any testimony or other evidence indicate that American Fast Freight had discretion to refuse workers Labor Ready sent to them under the contract except where it determined within the first two hours of work that a sent worker was not qualified.
Neither the contract nor Buckley's testimony clearly indicates that American Fast Freight retained the right to fire Labor *147 Ready workers.[36] The written contract between Labor Ready and its clients required the client to determine within the first two hours of a day whether a worker was qualified to perform the contracted work but was otherwise silent about American Fast Freight's ability to fire Labor Ready employees. The superior court cited Buckley's deposition testimony to support its decision that American Fast Freight could fire Labor Ready employees, but when Buckley was asked directly if, when "Labor Ready guys ... messed up, they got fired on the spot," Buckley replied, "I don't really know what happened to them" and commented that he was told they were sent home.
Buckley's other testimony is equivocal; the only testimony based on his direct observation[37] indicated that Labor Ready employees "got sent home" after they "didn't want to do that kind of work," with Buckley adding, "[T]hey would just leave and say, 'The hell with it.' They wouldn't even take the ticket." While this may permit an inference that American Fast Freight could fire the Labor Ready workers, it also permits an inference that the Labor Ready employees just left the job or that American Fast Freight determined the workers were not suitable during the first two hours of work.
There is also no evidence that Buckley specifically consented to the formation of an employment relationship with American Fast Freight. In contrast to the worker in Tuboscope , who was recruited and interviewed by the special employer,[38] Buckley was merely sent to provide general labor to American Fast Freight and did not consistently work for that company. Although Buckley wanted to be hired permanently by American Fast Freight, nothing in the record shows Buckley understood that by working on assignment as a general laborer for Labor Ready, he was an employee of American Fast Freight at the time of his injury.
In short, viewed in the light most favorable to Buckley and making reasonable inferences in his favor, the evidence in the record does not establish as a matter of law that Buckley had an implied employment contract with American Fast Freight. We therefore reverse the grant of summary judgment on the special employment relationship.
B. Material Factual Disputes Precluded Summary Judgment On The Question Whether Buckley's Injury Happened In The Course And Scope Of Employment.
Buckley filed a cross-motion for summary judgment, arguing that the injury did not occur in the course and scope of his employment with American Fast Freight. Based in part on factual concessions American Fast Freight made for purposes of the summary judgment motion only,[39] the superior court decided as a matter of law that the injury arose in the course and scope of Buckley's employment with American Fast Freight.
Buckley argues that under Estate of Milos v. Quality Asphalt Paving, Inc.[40] there is a material factual dispute about whether the accident happened in the course and scope of employment. He points to the following facts to support his argument: (1) he was on an unpaid lunch break; (2) he was motivated to *148 help his friends (the other truck drivers); and (3) because the workers were violating company policy and the conditions of service agreement between Labor Ready and American Fast Freight at the time of the accident, their actions should not be considered to be in the course of their employment.
American Fast Freight maintains that it met the summary judgment standard and there is no material factual dispute. It contends that Buckley's "clock status," i.e. whether he was on or off shift, was irrelevant because other factual circumstances tied his activities at the time of the accident to work with American Fast Freight: the accident occurred in the middle of the work shift, on a lunch break, and at a location that should be considered a job site because of the nature of the work. American Fast Freight argues that the activity Buckley engaged in was work-related, not purely personal, and benefitted American Fast Freight. It also asserts that the activity that caused the accident was reasonably foreseeable.
The parties agree Estate of Milos governs this case. In that case we reversed a summary judgment determining that an employee's death occurred in the course and scope of his employment.[41] We considered the definition of "arising out of and in the course of employment" in AS 23.30.395[42] and also identified the following factors from our precedent as being relevant to work-relatedness: (1) "whether 'the accidental injury or death is connected with any of the incidents of one's employment' ";[43] (2) "whether the employee's activity is 'reasonably contemplated and foreseeable by the employment situation' ";[44] and (3) "whether the activity benefits the employer in some way."[45]
Although our discussion in Estate of Milos focused on the employee's clock status at the time of the accident, we also considered the nexus between the activity that caused his death and his work.[46] The accident in Estate of Milos happened at a work site when an employee rode an employer-owned ATV to the top of a gravel pile underneath a live power line; his head contacted the power line, and he was electrocuted.[47] The parties in Estate of Milos principally disputed whether the possibility that the worker was "off-shift" at the time of the accident precluded summary judgment.[48] But three supervisors testified that the employee's use of the ATV was unauthorized - including one who said he would have fired the employee for using it - so we also discussed the impact of the decedent's unauthorized use of the ATV on the question of work-relationship.[49]
Like Estate of Milos , this case raises questions about clock status and violations of work rules. And as in Estate of Milos , the superior court broadly construed our precedent and determined that the work-relatedness of the accident made contested issues immaterial.[50] We did not need to decide in Estate of Milos whether the unauthorized use of the ATV alone would have taken the accident outside of the Act's coverage because we inferred that the estate conceded that "lack of authorization ... alone" would not do so.[51] And the employer agreed there was a genuine factual dispute about whether *149 it authorized the ATV's use.[52]
Turning to Buckley's case, we agree with American Fast Freight that Buckley's being on an unpaid lunch break does not determine whether the injury arose in the course and scope of employment. In Estate of Milos we agreed with the employer that an arbitrary line "making all post-shift accidents noncompensable" was undesirable.[53] And we looked at the "sensible compromise" in Larson's treatise, which considers whether the employee's activities that led to the injury are " 'necessary' or 'reasonably incidental' to [his] work."[54] Under this rule, the conceded fact that Buckley was on an unpaid lunch break does not take the accident outside the course and scope of employment. Larson's treatise indicates that lunchtime injuries occurring at a work site generally are compensable because the "course of employment should extend to any injury which occurred at a point where the employee was within range of dangers associated with the employment."[55] Buckley's work at American Fast Freight on the day of the injury necessarily took him outside of the warehouse, so his work site included the locations to which he accompanied Hawkins. The accident happened at such a location, so his clock status was largely irrelevant.
Buckley's activities at the work site, however, are not so easily classified as immaterial to the Act's coverage. In Estate of Milos we discussed both the statutory definition of "arising out of and in the course of employment" and factors we had applied in earlier cases related to this definition when discussing whether there was a "sufficient nexus" between the employee's actions and his employment.[56] Here the superior court looked at the factors from Estate of Milos but did not separately consider the underlying statutory definition. The factors complement the definition rather than displace it; we focused on them in Estate of Milos because we determined that the statutory definition "provide[d] little guidance" in resolving the question of work-relationship because of a permissible inference that the activity had not been sanctioned by the employer.[57]
Under AS 23.30.395(2), "arising out of and in the course of employment" includes "activities performed at the direction or under the control of the employer" and "employer-sanctioned activities at employer-provided facilities." We have construed the statute broadly, as the superior court noted, but we have never addressed the question confronting us here: does an injury that happens when a worker engages in an expressly prohibited activity fall within the statutory definition of "arising out of and in the course of employment" as a matter of law? The superior court decided it was immaterial that Buckley's activities violated the contract between American Fast Freight and Labor Ready. It also deemed immaterial American Fast Freight's representations to AKOSH investigators both that Buckley's duties were "limited to loading and stacking boxes and sweeping [the] floor" and that "no one but [a] driver is allowed to put chains on." But those facts and the reasonable inferences that can be drawn from them are material to the question of work-relationship.
Our discussion in Estate of Milos suggests the outcome we reach here. In Estate of Milos the employer argued that the worker's death arose out of and in the course of his employment as a matter of law, but we questioned whether the employee's actions could meet either part of the statutory definition as a matter of law.[58] As we said there, for an activity to fall within the statutory category of "activities performed at the direction or *150 under the control of the employer," "the activity must, at a minimum, be authorized by the employer."[59] Similarly, the other statutory category - "employer sanctioned activities" - presupposes that the employer allowed the activity. We cannot see how an activity that is expressly prohibited can as a matter of law fall within either category.
The superior court based its decision on its understanding of our precedent. But the cases the superior court cited involved work activities that were not expressly prohibited even if those activities were not part of the employee's regular job duties. In those cases we considered whether the activity the employee engaged in was "reasonably contemplated and foreseeable by the employment situation."[60] For example, in applying the "remote site" doctrine, we decided that an employee's trip to town to negotiate a paycheck was reasonably foreseeable and that an injury that happened while en route was thus compensable.[61] In Witmer v. Kellen , a case discussed by the superior court here, we decided that a car trip taken by William Witmer, the owner and sole shareholder of a corporation, with an employee of his corporation was work-related as a matter of law, despite Witmer's contention that the trip had no business purpose.[62] We said that Witmer's "position as president and sole shareholder ... cannot be ignored" and observed that he had "a great deal of flexibility and discretion regarding his daily activities."[63] In fact, we noted that as the employer Witmer "presumably ha[d] the sole authority to define or control his daily activities."[64] In neither case was the employee's activity expressly prohibited by contract or otherwise.
American Fast Freight asks us to adopt a "modern rule" from Larson's treatise on workers' compensation that brings within workers' compensation coverage "any activity undertaken in good faith by one employee to assist a co-employee in the latter's performance of his work."[65] The superior court quoted and applied this rule in deciding that Buckley's injury arose out of and in the course of employment as a matter of law. But Larson's treatise indicates that when an employee undertakes an action "outside his regular duties [that] is positively prohibited, it will probably be held to be outside the course of employment even if designed to advance the employer's work."[66]
American Fast Freight characterizes Buckley's activities as merely "mov[ing] outside his regular job duties to assist a co-worker." But there is a difference between performing work outside one's regular duties and engaging in actions that are specifically prohibited by an employer. Larson's treatise provides a number of examples and exceptions to the general rule,[67] and it distinguishes between violations of rules that "define the ultimate 'thing' which the claimant is employed to do" and violations of those that "describe the methods which [a claimant] may or may not employ in accomplishing that ultimate 'thing.' "[68] Only those actions encompassed in the first category are with any consistency considered outside the scope of workers' compensation.[69]
The distinction Larson's treatise makes is an important one. American Fast Freight argues that the Act "establish[es] a reciprocal relationship between an employer and employee" and that allowing employers and *151 employees to avoid the Act "by claiming that a term of the employment contract was breached would invite frequent litigation," undermining the purposes of the Act. Deviations from work rules that result in injuries may still occur within the course of employment, but the broad rule urged by American Fast Freight that completely disregards the extent of the employee's departure from his duties is contrary to the statutory definition in AS 23.30.395(2), which requires a nexus between the terms of the employment and the activity resulting in the injury.
Here American Fast Freight conceded for purposes of summary judgment only that the activity leading to Buckley's injury was prohibited by the contract between American Fast Freight and Labor Ready because it involved operating dangerous machinery. Furthermore American Fast Freight's representations to AKOSH that Buckley's job duties were "limited to loading and stacking boxes and sweeping [the] floor" and that "no one but [a] driver is allowed to put chains on" permit the inference that Buckley's activities were expressly not allowed. The superior court decided that the injury was reasonably foreseeable, but our precedent requires consideration of whether the activity leading to the injury was reasonably foreseeable.[70] Thus the question here is whether Buckley's participation in laying tire chains was reasonably foreseeable given the prohibition in the contract and American Fast Freight's apparent rule that only drivers could use chains.
We recognize that American Fast Freight might have benefitted from the workers' actions had the accident not happened and had they freed Carroll's truck, but we cannot disregard an employer's interest in exercising some control over its employees' activities. We are unable to adopt a rule of law that brings expressly prohibited activities within the statutory definition of "arising out of and in the course of employment." There may be factual situations that could bring this type of action within the scope of the Act - Larson's treatise summarizes cases illustrating the fine lines courts have drawn between rules about duties and rules about methods[71] - and it is certainly possible that as a matter of fact Buckley's injury was not a violation of the contract or was otherwise sanctioned by his employer. But because we are reviewing a ruling on summary judgment that was granted on conceded facts, we must assume that the actions leading to the injury were prohibited. We hold that such actions are not as a matter of law within the Act's scope.
V. CONCLUSION
We REVERSE the grant of summary judgment to American Fast Freight and REMAND the case to the trial court for further proceedings consistent with this opinion.

AS 23.30.001 -.400.

The sequence of phone calls was disputed by the participants in this accident, as was American Fast Freight's knowledge of Carroll's problem. This case is unusual in that the superior court granted summary judgment to American Fast Freight on both its motion for summary judgment and Buckley's cross-motion for summary judgment. See note 9, infra . We review all facts in the light most favorable to Buckley as the non-prevailing party on both motions. See Rockstad v. Erikson , 113 P.3d 1215, 1222 n.19 (Alaska 2005) ("Reviewing a grant of summary judgment, this court views all facts in the light most favorable to the non-prevailing party , not the non-moving party." (emphasis in original) (citing Ellis v. City of Valdez , 686 P.2d 700, 702 (Alaska 1984) )).

A diagram made by Hawkins shortly after the accident indicates that the rear driver-side drive wheel of Carroll's tractor was stuck.

9 P.3d 1013 (Alaska 2000).

For Buckley's lawsuit to be barred under AS 23.30.055, American Fast Freight must have been his employer and the injury must have arisen out of and in the course of the employment. See AS 23.30.010(a), .045, .055.

145 P.3d 533 (Alaska 2006).

Tuboscope Vetco, Inc. , 9 P.3d at 1017.

145 P.3d at 537-41.

The superior court wrote that it granted American Fast Freight's summary judgment motion and denied Buckley's cross-motion. But the court in fact also granted summary judgment to American Fast Freight on the issue presented in Buckley's cross-motion for summary judgment, whether the injury arose out of and in the course of the employment. Rather than proceeding to trial on the issue raised in Buckley's motion - the more common result of denial of summary judgment - the court dismissed the case and ordered American Fast Freight to file a proposed final judgment.

Estate of Milos , 145 P.3d at 536.

Mitchell v. Teck Cominco Alaska Inc. , 193 P.3d 751, 757 (Alaska 2008).

Id. at 760 n.25.

Christensen v. Alaska Sales &Serv., Inc. , 335 P.3d 514, 517 (Alaska 2014) (quoting State, Dep't of Highways v. Green , 586 P.2d 595, 606 n.32 (Alaska 1978) ).

Id. at 519.

Estate of Milos , 145 P.3d at 537.

Nickels v. Napolilli , 29 P.3d 242, 247 (Alaska 2001).

9 P.3d 1013, 1017 (Alaska 2000).

Id. (quoting 3 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 48.00, at 8-434 (1997)).

Id.

Id.

892 P.2d 164, 168 (Alaska 1995).

Childs v. Kalgin Island Lodge , 779 P.2d 310, 314 (Alaska 1989).

Id. (quoting 9 W. Jaeger, Williston on Contracts § 1012, at 4-5 (3d ed. 1967)).

Cluff , 892 P.2d at 172.

Id. (quoting 1B Arthur Larson , The Law of Workmen's Compensation §§ 48.11 to 48.12, at 8-440 (1992)).

We disagree with American Fast Freight's contention that "Buckley waived the right to claim on appeal that there were disputed facts." Buckley argued that Tuboscope was factually distinguishable from his case because, among other reasons, Buckley did not report directly to American Fast Freight. He also contended that the special employment doctrine should not apply to his case. Whether these arguments are viewed as a dispute about material facts or the legal conclusions to be drawn from the facts, we consider the point adequately preserved. Furthermore the party moving for summary judgment must provide sufficient admissible evidence to establish its right to judgment as a matter of law; it is only when the moving party makes this showing that the nonmoving party must provide evidence to show a factual dispute. See Christensen v. Alaska Sales & Serv., Inc. , 335 P.3d 514, 517 (Alaska 2014).

Anderson v. Tuboscope Vetco, Inc. , 9 P.3d 1013, 1015 (Alaska 2000).

Id.

Id. at 1016.

Id. at 1017-19.

Id. at 1018.

Id.

See id. at 1015, 1018 (noting that injured worker "was recruited, interviewed, and placed in his position by Tuboscope").

Buckley raised this issue in the superior court, arguing in his opposition to summary judgment that he "did not report directly to [American Fast Freight] ... and was still subject to assignment to other entities that contracted with Labor Ready."

"Hire" means "[t]o engage the labor or services of another for wages or other payment." Hire , Black's Law Dictionary (10th ed. 2014).

"Fire" means "[t]o discharge or dismiss a person from employment; to terminate as an employee." Fire , Black's Law Dictionary (10th ed. 2014).

The superior court cited generally to Buckley's deposition testimony, including testimony about a "rumor," which Buckley could not verify, that some Labor Ready employees "got picked up at the job site they were on" and sent home. In this part of the deposition, Buckley also repeated statements made to him by a truck driver for American Fast Freight.

Tuboscope Vetco, Inc. , 9 P.3d at 1015.

For purposes of summary judgment only, American Fast Freight conceded the following: Buckley's injuries resulted in part from negligence on the part of American Fast Freight and its employees; Carroll and Hawkins violated company rules when they tried to free the truck on their own and when they allowed Buckley to help; allowing Buckley to use tire chains violated the contract between American Fast Freight and Labor Ready because it involved operating dangerous equipment; and Buckley and Hawkins were on an unpaid lunch break at the time of the accident.

145 P.3d 533 (Alaska 2006).

Id. at 541.

In relevant part, AS 23.30.395(2) defines "arising out of and in the course of employment" as including "activities performed at the direction or under the control of the employer; and employer-sanctioned activities at employer-provided facilities; but excludes ... activities of a personal nature away from employer-provided facilities."

Estate of Milos , 145 P.3d at 538 (quoting M-K Rivers v. Schleifman , 599 P.2d 132, 134-35 (Alaska 1979) ).

Id. (quoting M-K Rivers , 599 P.2d at 136 ).

Id. (citing Luth v. Rogers & Babler Constr. Co. , 507 P.2d 761 (Alaska 1973) ).

Id. at 539-41.

Id. at 535.

Id. at 537.

Id. at 535, 538-40.

See id. at 536 (noting that superior court determined estate's factual contentions were immaterial because of strong relationship between employer's actions and worker's accident).

Id. at 538 n.11.

Id. at 539 n.16.

Id. at 540.

Id. (quoting 2 Arthur Larson & Lex Larson, Larson's Workers' Compensation Law § 21.06[1][a] (2005)).

2 Arthur Larson et al., Larson's Workers' Compensation Law 13-1 (2018); see id. §§ 13.01[5], 13.05 (providing explanation of work-relationship of accidents happening on unpaid lunch breaks and reasons for applying same rules to lunch breaks as those that apply to time before and after work).

145 P.3d at 538-39, 541 (quoting AS 23.30.395(2) ).

Id. at 538-39.

Id. at 538-39.

Id. at 539 n.16.

M-K Rivers v. Schleifman , 599 P.2d 132, 136 (Alaska 1979).

Id. at 134-36.

884 P.2d 662, 666-67 (Alaska 1994).

Id. at 666.

Id.

3 Larson , supra note 55, § 27.01[1], at 27-2.

Id. § 27.01[4], at 27-6; see also id. § 33.01[4][a], at 33-7 (observing that modern rule that brings work done outside regular duties within compensation coverage "assumes that no prohibition is thereby infringed").

Id. §§ 27.01[4], 33.01[4], 33.02[1].

Id. § 33.02[1], at 33-10; see also Merchant v. Pinkerton's Inc. , 50 N.Y.2d 492, 429 N.Y.S.2d 598, 407 N.E.2d 443, 445 (1980) (distinguishing between "rule defin[ing] what the employee's duties are" and one defining "how those duties are to be performed").

3 Larson , supra note 55, § 33.01[4], at 33-7.

See Estate of Milos v. Quality Asphalt Paving, Inc. , 145 P.3d 533, 538 (Alaska 2006) ; M-K Rivers v. Schleifman , 599 P.2d 132, 136 (Alaska 1979) ; Marsh v. Alaska Workmen's Comp. Bd. , 584 P.2d 1134, 1136 (Alaska 1978).

3 Larson , supra note 55, §§ 27.01[4], 33.01[4], 33.02[1].